**TEXAS INSTRUMENTS, INC., Appellant,**

v.

**UNITED STATES INTERNATIONAL TRADE COMMISSION, Appellee.**

**Appeal No. 85–2776.**

United States Court of Appeals, Federal Circuit.

Nov. 19, 1986.

---

James F. Davis, Howrey and Simon, Washington, D.C., argued for appellant. With him on the brief was Kenneth E. Krosin. Also on the brief were Melvin Sharp, Richard L. Donaldson and David V. Carlson, Texas Instruments, Inc., of Dallas, Tex.

Wayne W. Herrington, Office of the Gen. Counsel, of U.S. Intern. Trade Com'n, Washington, D.C., argued for appellee. With him on the brief were Lyn N. Schlitt, Gen. Counsel and Michael P. Mabile, Asst. Gen. Counsel.

Before DAVIS, Circuit Judge, COWEN, Senior Circuit Judge, and NEWMAN, Circuit Judge.

PAULINE NEWMAN, Circuit Judge.

In this action brought under section 337 of the Tariff Act of 1930 as amended, 19 U.S.C. § 1337, Texas Instruments, Inc. ("TI") appeals the final decision of the United States International Trade Commission. The Commission held that there was no statutory violation in that TI's U.S. Patent No. 3,819,921 (" '921 patent") was not infringed by certain imported calculators, and that there was no industry in the United States practicing an invention covered by any claim of the '921 patent.[1] We affirm the decision of non-infringement, and thus do not reach the issue of whether there was injury to a domestic industry.

*Commission Proceedings*

Texas Instruments alleged unfair methods of competition and unfair acts in the importation and sale of certain portable electronic calculators, based on the infringement of claims 1, 2, 6, 7, 30, 37, 41 and 53 of the '921 patent, and that the effect or tendency of the unfair methods and acts was to destroy or substantially injure an efficiently and economically operated industry in the United States. The Commission ordered an investigation. 49 Fed.Reg. 29,162 (1984). Twenty-one respondents were named. For details as to the parties and the proceedings, reference is made to the Commission's decision, familiarity with which is presumed. Three respondents settled with TI during the

---

**1.** *In re Certain Portable Electronic Calculators,* Inv. No. 337–TA–198, USITC Pub. No. 1732 (July 1985).

course of the proceedings, and respondents Nam Tai Electronics Co. Ltd., International Merchandising Associates Hong Kong, and Enterprex appeared at the hearing. Nam Tai subsequently settled with TI, taking worldwide licenses to all of TI's calculator patents including the '921 patent.

In the initial determination of April 18, 1985, the administrative law judge ("ALJ") considered first the defense of patent invalidity under 35 U.S.C. §§ 103 and 112, and held that the claims at issue had not been proven invalid, stating: "The presumption of validity afforded those claims under 35 U.S.C. § 282 remains unrebutted and in full effect." The Commission affirmed, and this aspect of the decision has not been appealed.

The ALJ held that TI had not sustained its burden of proving that any of the patent claims was infringed by any of the imported calculators, and that because "complainant does not produce calculators in accordance with the claims in issue of the '921 patent, no domestic industry exists." The Commission adopted these determinations. None of the respondents participated in this appeal. The Commission is the sole appellee, and appears to defend the merits of its decision.

### A.

The '921 patent entitled "Miniature Electronic Calculator" was issued on June 25, 1974 to inventors Jack S. Kilby, Jerry D. Merryman and James H. Van Tassel, assignors to Texas Instruments. The '921 patent derives, through a series of continuation applications, from application Serial No. 671,777 filed September 29, 1967. It represents a pioneering invention, for which the inventors and TI have been recognized. The prototype calculator was accepted for the permanent collection of the Smithsonian's Museum of History and Technology. Patent claim 1 is representative:

1. A miniature, portable, battery operated electronic calculator comprising:

a. input means including a keyboard for entering digits of numbers and arithmetic commands into said calculator and generating signals corresponding to said digits and said commands, the keyboard including only one set of decimal number keys for entering plural digits of decimal numbers in sequence and including a plurality of command keys;

b. electronic means responsive to said signals for performing arithmetic calculations on the numbers entered into the calculator and for generating control signals, said electronic means comprising an integrated semiconductor circuit array located in substantially one plane, the area occupied by the integrated semiconductor array being no greater than that of the keyboard, said integrated semiconductor circuit array comprising:

i. memory means for storing digits of the numbers entered into the calculator,

ii. arithmetic means coupled to said memory means for adding, subtracting, multiplying and dividing said numbers and storing the resulting answers in the memory means, and

iii. means for selectively transferring numbers from the memory means through the arithmetic means and back to the memory means in a manner dependent upon the commands to effect the desired arithmetic operation;

c. means for providing a visual display coupled to said integrated semiconductor circuit array and responsive to said control signals for indicating said answer; and

d. the entire calculator including keyboard, electronic means, means for providing a visual display, and battery being contained within a "pocket sized" housing.

The specification contains a detailed description of the then preferred means of performing each step of the claims. In the

seventeen years between the first filing of the patent application and filing of the complaint with the Commission, each such means has undergone technological advance. TI asserts that the means used in the accused calculators perform the functions that are specifically set forth in the '921 claims, and that by correct claim interpretation these claims are infringed because the means used in the accused calculators are substantially the same as, or equivalent to, the means illustrated in the specification.

The Commission adopted the ALJ's extensive findings and conclusions, wherein the ALJ construed the claims in light of the specification and found no claim infringed, either literally or in terms of the doctrine of equivalents.

TI argues that substantial evidence does not support the finding of non-infringement, in that the invention as embodied in the accused calculators is fundamentally the same as that of the '921 claims, that the '921 patent represents the giant step in the development of semiconductor technology and integrated circuitry on which is based the entire industry of hand-held calculators, and that the claims are not restricted to the preferred embodiments as they existed at the time the patent application was filed.

TI points to the established law that it is not necessary that the specification have described or that the inventors have foreseen each specific means now used to perform each of the functions of the claims. TI emphasizes that this basic patent on a pioneering invention is entitled to be interpreted broadly, and indeed this proposition is long-established, *see, e.g., Continental Paper Bag Co. v. Eastern Paper Bag Co.,* 210 U.S. 405, 415, 28 S.Ct. 748, 749–50, 52 L.Ed. 1122 (1908).

■ Analysis of patent infringement entails two inquiries: determination of the scope of the claims, as a matter of law; and the factual finding of whether properly construed claims encompass the accused structure.[2] *Mannesmann Demag Corp. v. Engineered Metal Products Co.,* 793 F.2d 1279, 1282, 230 USPQ 45, 46 (Fed.Cir.1986); *Caterpillar Tractor Co. v. Berco, S.P.A.,* 714 F.2d 1110, 1114, 219 USPQ 185, 187 (Fed.Cir.1983). This analytical framework applies whether claims are asserted to be infringed literally or by application of the doctrine of equivalents.

■ Literal infringement requires that the accused device embody every element of the claim as properly interpreted. *Mannesmann,* 793 F.2d at 1282, 230 USPQ at 46; *Stewart-Warner Corp. v. City of Pontiac,* 767 F.2d 1563, 1570, 226 USPQ 676, 681 (Fed.Cir.1985). If the claim describes a combination of functions, and each function is performed by a means described in the specification or an equivalent of such means, then literal infringement holds. *See D.M.I., Inc. v. Deere & Co.,* 755 F.2d 1570, 1575, 225 USPQ 236, 239 (Fed.Cir. 1985). This prescription derives from 35 U.S.C. § 112 paragraph 6:

> An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

The statute thus provides, and extensive judicial analysis has reinforced, that when the claimed invention is a novel combination of steps, all possible methods of carrying out each step of the combination are not required to be described in the specification. Correctly construed claims cover "equivalents of the described embodiments". *King Instrument Corp. v. Otari Corp.,* 767 F.2d 853, 862, 226 USPQ 402, 408 (Fed.Cir.1985), *cert. denied,* —— U.S.

---

**2.** Factual findings of the Commission are reviewed to determine whether they are supported by substantial evidence. 19 U.S.C. § 1337(c); 5 U.S.C. § 706. Legal conclusions are reviewed for correctness.

——, 106 S.Ct. 1197, 89 L.Ed.2d 312 (1986); *see also Palumbo v. Don-Joy Co.*, 762 F.2d 969, 974, 226 USPQ 5, 8 (Fed.Cir.1985); *D.M.I.*, 755 F.2d at 1579, 225 USPQ at 238.

■ The purpose is to grant the inventor of a combination invention a fair scope that is not dependent on a catalogue of alternative embodiments in the specification. This court has cautioned against limiting the claimed invention to preferred embodiments or specific examples in the specification. *Palumbo*, 762 F.2d at 977, 226 USPQ at 10. The details of performing each step need not be included in the claims unless required to distinguish the claimed invention from the prior art, or otherwise to specifically point out and distinctly claim the invention. 35 U.S.C. § 112 paragraph 2; *In re Lundberg*, 244 F.2d 543, 547–48, 113 USPQ 530, 534 (CCPA 1957); *In re Arbeit*, 206 F.2d 947, 958, 99 USPQ 123, 131–32 (CCPA 1953).

These principles are not unlimited in their application, but reflect the equitable concept that claims should be read in a way that avoids enabling an infringer to "practice a fraud on a patent." *Graver Tank & Manufacturing Co. v. Linde Air Products Co.*, 339 U.S. 605, 608, 70 S.Ct. 854, 856, 94 L.Ed. 1097, 85 USPQ 328, 330 (1950). It has long been recognized that the range of permissible equivalents depends upon the extent and nature of the invention, and may be more generously interpreted for a basic invention than for a less dramatic technological advance. *Continental Paper Bag Co.*, 210 U.S. at 414, 28 S.Ct. at 749; *Miller v. Eagle Manufacturing Co.*, 151 U.S. 186, 207, 14 S.Ct. 310, 318–19, 38 L.Ed. 121 (1894). The questions of claim interpretation raised in this case turn on the issue of the breadth of equivalents to which the claims are entitled. As in many aspects of patent law, the legal conclusions are intertwined with, and depend upon, the technological facts.

■ It is not required that those skilled in the art knew, at the time the patent application was filed, of the asserted equivalent means of performing the claimed functions; that equivalence is determined as of the time infringement takes place. *Atlas Powder Co. v. E.I. du Pont de Nemours & Co.*, 750 F.2d 1569, 1581, 224 USPQ 409, 417 (Fed.Cir.1984); *see also American Hospital Supply Corp. v. Travenol Laboratories, Inc.*, 745 F.2d 1, 8, 223 USPQ 577, 583 (Fed.Cir.1984) ("the Commission erred in determining equivalence at the time of invention without regard to subsequent developments in the art"). Technological "embellishment" made possible by the patent's disclosure "does not allow the accused [device] to escape the 'web of infringement'". *Hughes Aircraft Co. v. United States*, 717 F.2d 1351, 1365, 219 USPQ 473, 483 (Fed.Cir.1983) (quoting *Bendix Corp. v. United States*, 600 F.2d 1364, 1382, 220 Ct.Cl. 507, 204 USPQ 617, 631 (1979)).

■ Devices that have been modified to such an extent that the modification may be separately patented may nonetheless infringe the claims of the basic patent. *See Atlas Powder*, 750 F.2d at 1580, 224 USPQ at 417 (infringement will be found where the material features of the patent have been appropriated, even when these features have been patentably improved). Similarly, the modification of an accused device does not negate infringement when that device has adopted the features of the claims or their equivalents. *See Radio Steel & Manufacturing Co. v. MTD Products, Inc.*, 731 F.2d 840, 847–48, 221 USPQ 657, 663–64 (Fed.Cir.), *cert. denied*, 469 U.S. 831, 105 S.Ct. 119, 83 L.Ed.2d 62 (1984) (modification of feature to perform equivalent function held as infringement, as is appropriation of patented feature to perform an additional function); *Amstar Corp. v. Envirotech Corp.*, 730 F.2d 1476, 1482, 221 USPQ 649, 653 (Fed.Cir.), *cert. denied*, 469 U.S. 924, 105 S.Ct. 306, 83 L.Ed.2d 240 (1984) (quoting *McCullough Tool Co. v. Well Surveys, Inc.*, 343 F.2d 381, 402, 145 USPQ 6, 22 (10th Cir.1965),

*cert. denied*, 383 U.S. 933, 86 S.Ct. 1061, 15 L.Ed.2d 851 (1966) ("infringement cannot be avoided by the mere fact that the accused device is more or less efficient or performs additional functions")).

TI argues that the Commission required too narrow a construction of the '921 patent claims, contrary to this body of precedent, so that the Commission in effect limited the claims to the means that were illustrated in the specification. As stated in *D.M.I.:*

> To interpret "means plus function" limitations as limited to a particular means set forth in the specification would be to nullify the provision of § 112 requiring that the limitation *shall* be construed to cover the structure described in the specification *and* equivalents thereof. Patentees are required to disclose in the specification some enabling means for accomplishing the function set forth in the "means plus function" limitation.

755 F.2d at 1574, 225 USPQ at 238 (emphasis in original). Pertinent is the court's holding that

> there is and can be no requirement that applicants describe or predict every possible means of accomplishing that function.

*Id.* TI asserts that the accused devices perform all the steps of the claims, and that the detailed means by which these steps are carried out, where not described or predicted by the patentees, are the same as or equivalent to the means described in the specification.

The ALJ considered each step of the claims, and made extensive findings as to the structure and operation of the accused calculators in comparison with that described in the '921 specification. The ALJ's findings on the structure of the various devices are generally uncontroverted on this appeal, but his findings as to their operation, as well as his construction of the claims, are contested as is the conclusion of noninfringement.

In brief summary, either the ALJ found, or it was uncontested, that each of the accused calculators was a miniature, portable, battery operated device contained within a "pocket-sized" housing (preamble and clause d of claim 1); having a keyboard for entering digits of numbers and arithmetic commands into the calculator (clause a); an integrated semiconductor circuit located in substantially one plane and having memory, arithmetic, and transfer means (clause b and subclauses i, ii, and iii); and a visual display (clause c). The ALJ found that each of the functions of clauses a, b, and c was performed in the accused devices by a means that was not described in the '921 patent, and that each such means was not equivalent to the means shown in the specification. Although we conclude that substantial evidence did not support each such determination of non-equivalence as to each claim clause considered separately, we conclude that the accused devices do not infringe properly construed claims when the invention and the accused devices are viewed as a whole.

The ALJ's analysis of each "means" clause is pertinent to this determination:

### Clause a—Input Means

The keyboard input means of the '921 patent, described in claim 1 as "including only one set of decimal number keys", was distinguished from the prior art decade-type keyboards during prosecution before the Patent Office. It was uncontroverted that the prior art described no calculator keyboard that functioned with a single set of decimal keys.

All of the accused calculators have the claimed "one set of decimal number keys". TI argues that this distinction is fundamental to its design of a miniature calculator, and is the only critical limitation to the input means, whereas the specific mode of internal operation of the keyboard is not limited to that illustrated in the specification.

The '921 specification describes a mechanism for the keyboard operation whereby

pressure on a key causes a conductive layer on the underside of the key to contact and short circuit conductive strips lying underneath, to produce a unique binary signal that is encoded and transmitted. An alternative embodiment is described having a conductive pattern wherein signal encoding is accomplished by the calculator memory logic. The keyboard encoder, a separate invention of Jack S. Kilby and James H. Van Tassel, is patented as U.S. Patent No. 3,696,411, the entire disclosure of which is incorporated by reference into the '921 patent.

Clause a of Claim 1 is specific to a keyboard input means for entering digits and commands and generating signals corresponding thereto. TI observes that the prosecution history does not limit the keyboard input means beyond the limitation to one set of decimal keys, which the accused keyboards all have. Experts on both sides agreed that the keyboards of the accused devices and of the '921 specification entered digits and commands and generated corresponding binary signals, but by a different internal mechanism. The accused keyboards use a scanning matrix encoder, which scans the keyboard at clock intervals in order to determine which key is depressed. Scanning matrix systems are described in Caudel and Raymond U.S. Patent No. 4,021,656, entitled "Data Input for Electronic Calculator or Digital Processor Chip", filed November 19, 1974 and issued May 3, 1977. This patent, assigned to Texas Instruments, is not asserted in this action.

The ALJ found that in a scanning matrix system the keyboard does not generate unique signals corresponding to digits and commands, and thus that the keyboard systems are not equivalent because they do not operate in substantially the same way. TI asserts that this finding is not supported by substantial evidence and reflects incorrect claim construction as a matter of law. TI asserts that claim clause a reads literally on the accused keyboards and that the

internal operation of the keyboard is not material because the claimed invention lies in the "operation of the keyboard in the calculator combination to operate a unique signal for each key", not in the details of each step. Inventor Kilby described the scanning matrix as a "new invention", but testified that there is no change in the elements of the calculator:

In all cases the elements of the calculator remain basically the same, although the costs have been significantly reduced. Most of these reductions have come about because of economies of scale in production and a move to lower cost labor areas. In other cases new inventions have contributed to the reduction in cost. An example of this would be in the keyboard. As the cost of logic was reduced, it became economically desirable to reduce the interconnections required for the chip at the expense of increased logic. The scanning keyboard is one example of this practice [clause a], while another can be found in the current means of driving the display [clause c]. Neither change has any impact on the operation of the calculator. Depressing the "2" key still sends a unique signal meaning "2" to the calculator. The calculator would be useless if it did not.

TI argues that the Commission made a fundamental error in claim construction by requiring that the means of performing the input be technologically as well as functionally identical. TI states that the Commission erroneously required scientific equivalence of the keyboards' internal operations. TI emphasizes that the invention of the '921 patent lies in the claimed combination, that the essential elements of the invention are contained in the claims, and that the accused devices also contain these elements. TI argues that the Commission erred as a matter of law in limiting the '921 claims to the specific input means illustrated in the specification, and then by determining absence of infringement on the basis of this limitation.

## Clause b—Electronic Means

The "electronic means" is claimed as an "integrated semiconductor circuit array", a phrase coined by the inventors, for "performing arithmetic calculations on the numbers entered into the calculator and for generating control signals". The claims require that the array be located in substantially one plane, and be no larger than the keyboard. The specification shows an array of four integrated semiconductor circuits, three integrated semiconductor shift registers, and two resistors, interconnected by printed conductors located in one plane on an insulating substrate. An alternative embodiment in the specification, and claimed specifically in claim 2, locates the array on a single semiconductor wafer.

The integrated semiconductor array provides the logic of the calculator, performing the arithmetic, memory, and transfer functions set forth in sub-clauses i, ii, and iii of clause b. The specification describes each integrated circuit, in detail, as having a series of interconnected gates or logic circuits, constructed of, *inter alia*, bipolar transistors. The shift registers also use bipolar transistors. The shift register is the subject of a separate TI patent of Jerry D. Merryman entitled "Information Transfer System", U.S. Patent No. 3,573,754, incorporated by reference into the '921 disclosure.

The ALJ held that the "integrated semiconductor circuit array" of the '921 claims was limited to "a plurality of distinct, circuit structures or components that are electrically interconnected, each individual circuit structure or component of the array, whether the array is on a wafer or a plurality of wafers, having its own functional identity and separate in space"; that is, the specific structure described in the '921 specification. The ALJ found that the accused calculators all use a single integrated circuit, and concluded that there was neither identity nor equivalence of means for performing the electronic function.

TI asserts that this holding is incorrect as a matter of claim construction, and also that the finding of non-equivalence is not supported by substantial evidence. TI argues that as illustrated in the specification the electronic means may be an arrangement of four integrated semiconductor circuits and three integrated semiconductor shift registers in one plane smaller than the keyboard or, alternatively, a single wafer containing on it the four circuits and three shift registers. TI describes the corresponding electronic means in the accused devices as a single semiconductor wafer or chip using integrated circuitry. All perform arithmetic calculations and generate control signals using integrated circuitry. TI points out that the prosecution history of the '921 claims does not require the restricted definition of "integrated semiconductor circuit array" that was imposed by the ALJ.

All parties agree that there have been many improvements in the miniaturization of integrated circuitry and advances in semiconductor technology. Witnesses on both sides agreed that the electronic means of the accused devices and that described in the '921 patent use integrated semiconductor circuitry. TI argues that the difference between the semiconductor circuitry of the accused devices and the semiconductor circuit array of the '921 patent is "simply size", that both are located in substantially one plane as the claims require, and perform the arithmetic, memory and transfer functions of the claims.

The ALJ also found that because the '921 patent specification describes only bipolar transistors, the use of metal oxide semiconductor ("MOS") transistors in the accused calculators serves to avoid infringement. The '921 specification does not mention metal oxide semiconductors, but neither does it limit the semiconductor to the bipolar form. There was unrebutted testimony by inventor Merryman that metal oxide semiconductors were known at the time the '921 invention was made, and were rejected as the best mode then known "since MOS was not yet reliable". Respon-

dents' expert testified that MOS and bipolar transistors are made from the same basic semiconductor materials, but that MOS transistors have the advantage of not requiring a constant flow of current for logic functions as do bipolar. It was also uncontroverted that MOS transistors have now replaced bipolar transistors as the switch of choice in the circuitry of miniaturized calculators. TI argues that the claims of the '921 patent were erroneously construed as limited to bipolar transistors, because the two types of transistors "function in the same way in calculator digital circuits, i.e., as electronic switches", and that MOS transistors were a known alternative to bipolar transistors, as demonstrated by U.S. Patent No. 3,453,601 entitled "Two Speed Arithmetic Calculator", assigned to Philco Ford, filed October 18, 1966 and issued July 1, 1969. TI asserts that the "invention of the '921 patent resides in the achievement of a threshold size and power consumption; transistors which meet these threshold requirements are interchangeable".

The ALJ found that TI's prototype calculator "was built with bipolar or discrete technology using discretionary wiring". TI argued the interchangeability of the electronic means on the basis of a Japanese publication describing a desk calculator, and on the basis of the ready conversion of bipolar circuitry to MOS. The ALJ found that MOS and bipolar transistor technologies are not interchangeable because of differences in surface area and power consumption. The ALJ thus found the electronic means of the accused calculators not equivalent to that described in the '921 specification or within the scope of the '921 claims.

*Clause c—Display Means*

The display means receives information from the keyboard and the electronic means and converts it into a visual display. The visual display is not limited in claim 1 to any particular form, but is shown in the specification as a thermal printer with semiconductor heater elements which are selectively energized to create dots on a tape in the form of numbers or symbols. The accused devices all use liquid crystal displays ("LCD").

The thermal printer is specifically claimed in this overall combination in claim 4 of the '921 patent, not here asserted. The thermal printer is separately patented by TI in U.S. Patent No. 3,501,615 entitled "Integrated Heater Element Array and Drive Matrix", inventors Jerry D. Merryman and Edward M. Ruggiero, incorporated by reference in the '921 specification.

The ALJ construed the scope of clause c to be limited to the thermal printer, and held that the LCDs of the accused devices are not the same as or equivalent to the thermal printer. As found by the ALJ, an LCD consists of two glass electrode-coated sheets between which is sealed a liquid crystalline material; the application of voltage between the electrode coatings effects the arrangement of molecules in the material to form visible characters. The ALJ distinguished the thermal printer from the LCD in its method of operation, finding that the printer produces a hard copy requiring a continuous input of paper, while the LCD has a continuously pulsed line segment display. Inventor Kilby testified that he had never seen a thermal printer on either a thin "credit card" or a solar powered calculator. On the basis of the inventor's testimony and that of the respondents' technical expert, the ALJ concluded that the greater size and power requirements of the thermal printer precluded equivalence with the LCD.

TI argues that the ALJ applied an incorrect standard by focusing on the differences in operation, and that the correct standard was whether the LCD served as a visual display means in the claimed combination. Inventor Kilby testified that the use of a LCD was merely a functional substitution of one display means for another, and that after the LCD was devel-

oped its replacement of the thermal printer was a matter of ordinary skill. Kilby testified that cathode ray tubes, "nixie" tubes, light emitting diodes, and LCDs are all examples of visual displays, and that:

> In their physical embodiments they have nothing in common, but all are readable by the eye. So is a printed output. All are visual displays and fully within the '921 patent.

TI argues that the ALJ erred in limiting claim 1 to the thermal printer specifically claimed in claim 4, citing *Palumbo*, 762 F.2d at 977, 226 USPQ at 10, and the "immutable and universally applicable" rule of claim differentiation of *D.M.I.*, 755 F.2d at 1574, 225 USPQ at 239. The Commission argues that the ALJ did not read the limitation of claim 4 into claim 1, but rather interpreted the visual display means of claim 1 as limited to the thermal printer described in the specification and its equivalents. The Commission asserts that none of the accused devices uses any kind of printer, and that "[i]t is manifest that an LCD display is not equivalent to the '921 thermal printer".

### The Invention as a Whole

The '921 patent claims are all written in the form appropriate to a multi-step combination invention, wherein each step of a novel combination is described in terms of its function in the total combination. Each such function is presented in the "means" form contemplated by 35 U.S.C. § 112 paragraph 6, and each such means is illustrated in the specification in accordance with the statutory requirement under 35 U.S.C. § 112 paragraph 1 to set forth the best mode then known to the inventors.

■ TI correctly states and the ALJ so found, that every function described in the '921 patent claims is performed by the accused calculators. There was not substantial evidence to the contrary. The ALJ, finding that each of the means of performing these functions in the accused

calculators embodied, to varying degrees, new or improved technology over that known or developed at the time the '921 patent application was filed, held that the means of each step was not equivalent to that shown in the specification, and thus found the claims not infringed. As a matter of law, subsequent improvements do not in themselves preclude a finding of infringement. *Atlas Powder*, 750 F.2d at 1580–81, 224 USPQ at 417; *Hughes Aircraft*, 717 F.2d at 1365, 219 USPQ at 483.

We conclude that the ALJ interpreted the claims too narrowly when he, in effect, limited each means to the embodiment shown in the specification. As stated in *D.M.I.*:

> The statute, § 112–6, was written precisely to avoid a holding that a means-plus-function limitation must be read as covering only the means disclosed in the specification.

755 F.2d at 1574, 225 USPQ at 238. *See also Radio Steel*, 731 F.2d at 848, 221 USPQ at 663 (quoting *Lockheed Aircraft Corp. v. United States*, 553 F.2d 69, 82, 213 Ct.Cl. 395, 193 USPQ 449, 460 (1977) ("where a claim sets forth a means for performing a specific function, without reciting any specific structure for performing that function, the structure disclosed in the specification must be considered, and the patent claim construed to cover both the disclosed structure and equivalents thereof")).

■ As an aid in determining the breadth of equivalents to be afforded means plus function clauses under section 112, the prosecution history, the other claims in the patent, expert testimony, and the language of the asserted claims may be considered in addition to the specification. *King Instrument*, 767 F.2d at 862, 226 USPQ at 408; *Palumbo*, 762 F.2d at 975, 226 USPQ at 8. The pioneer status of the invention also requires consideration. *Continental Paper Bag*, 210 U.S. at 415, 28 S.Ct. at 749–50. As explained in *Claude Neon Lights, Inc. v. E. Machlett & Son*, 36

F.2d 574, 576 (2d Cir.1929) (L. Hand, J.), cert. denied, 281 U.S. 741, 50 S.Ct. 347, 74 L.Ed. 1155 (1930):

> [T]he claim is not to be taken at its face—however freely construed—but its elements may be treated as examples of a class which may be extended more or less broadly as the disclosure warrants, the prior art permits, and the originality of the discovery makes desirable.
>
> \* \* \* \* \* \*
>
> The usual ritual, ... that the same result must follow by substantially the same means, does not help much in application; it is no more than a way of stating the problem. Any decision is therefore bound to have an arbitrary color, as in all close cases of interpretation....

While the scope of patent claims under section 112 paragraph 6, is a legal determination, it is not devoid of equitable considerations, particularly when determining the breadth of "means" claims on complex and rapidly-evolving technologies. Thus it has long been recognized, as affirmed in Graver Tank, 339 U.S. at 609, 70 S.Ct. at 856–57:

> Equivalence, in the patent law, is not the prisoner of a formula and is not an absolute to be considered in a vacuum. It does not require complete identity for every purpose and in every respect. In determining equivalents, things equal to the same thing may not be equal to each other and, by the same token, things for most purposes different may sometimes be equivalents. Consideration must be given to the purpose for which an ingredient is used in a patent, the qualities it has when combined with the other ingredients, and the function which it is intended to perform.

However, this does not mean that there is no limit on changed means of performing a claimed function, such that literal infringement can never be avoided. There must be outer boundaries to the scope of these rules, as for most rules, when the factual situation strains their rote application and requires a fresh look at the rules in the new context in which they are presented. There is no abstract guide to determining when a modified device crosses the boundary with respect to the reasonable scope of patent claims. Indeed, the determination of infringement is not made in the abstract, but in the context of the claimed invention and the accused devices. Graver Tank, 339 U.S. at 607, 70 S.Ct. at 855–56; Amstar Corp. v. Envirotech Corp., 730 F.2d at 1481–82, 221 USPQ at 653.

TI argues eloquently that consideration of the breadth of equivalents for its pioneering invention requires emphasis on the function of each step of the combination as claimed, and not on the specific means of performing each step that is set forth in the patent's disclosure. Before the Commission TI asserted that the '921 invention created a totally new market for electronic calculating devices, that there is nothing remotely similar in the prior art, and that "[t]his portable, miniature, battery operated calculator is a dramatic advance deserving pioneer status." Indeed, we agree.

TI asserts that the correct interpretation of the '921 claims does not limit the claims to the means described in the specification and to those equivalents that are operationally identical, but extends to include corresponding means that perform substantially the same function in substantially the same way to obtain the same result within the combination of the claims. We agree, and as we have stated, we conclude that when each changed means is considered separately, as part of the overall device as described by the inventors, substantial evidence may not support the finding that the resultant device is not an infringement of the '921 claims. However, this is not the situation before us.

▆ Mindful of the admonition so often urged by us, it is the claimed invention as a whole that must be considered in determining whether there is infringement by the accused devices also considered as a whole.

It is not appropriate in this case, where all of the claimed functions are performed in the accused devices by subsequently developed or improved means, to view each such change as if it were the only change from the disclosed embodiments of the invention. It is the entirety of the technology embodied in the accused devices that must be compared with the patent disclosure. *D.M.I.*, 755 F.2d at 1575, 225 USPQ at 239; *see also Hughes Aircraft*, 717 F.2d at 1363–64, 219 USPQ at 482–83. Any other view distorts both the correct interpretation of the claims and their application to the accused devices.

The ALJ observed that it was not entirely clear from the record before him whether all the accused calculators embodied all of the technological changes here discussed. We have not considered the infringement status of calculators containing fewer modifications than those discussed by the ALJ, but have based our conclusion on the accused devices generally found by the ALJ. We do not pass at all on the infringement status of devices embodying less than the full combination of changes.

TI observes that in *Decca Ltd. v. United States,* 554 F.2d 1070, 210 Ct.Cl. 546, 191 USPQ 439 (1976), *confirmed in part, modified in part,* and *overturned in part,* 640 F.2d 1156, 225 Ct.Cl. 326, 209 USPQ 52 (1980), *cert. denied,* 454 U.S. 819, 102 S.Ct. 99, 70 L.Ed.2d 89 (1981), *Lockheed,* and *Hughes Aircraft,* the courts held a digital computer equivalent to an analog computer even though the digital computer was an improvement, because both performed the same function in the claimed electronic systems. By analogy, TI argues that in "fast-moving" arts infringers should not be permitted to avoid liability by arguing that the improved elements substituted in the patented combination operate in a different "way." TI asserts that to fail to find infringement under these circumstances "will emasculate electronics patents by limiting the scope of their claims to the specific embodiments disclosed in the specification."

The '921 specification describes the calculator as having the dimensions 4¼ inches by 6⅛ inches by 1¾ inches, and weighing 45 ounces, providing "a miniature portable electronic calculator of pocket-size dimensions." We agree with TI that a mere change in size due to improved miniaturization by technological advance does not in itself save the accused devices from infringement, and that the Commission erred to the extent that it construed the claims as limited to the 1967 state of the art of integrated semiconductor circuitry. Were the electronic means of clause b the only change, the record may not contain substantial evidence in support of the ALJ's finding of non-infringement. But viewing all of the modifications in the accused devices, we conclude that they reflect more than mere substitution of "an embellishment made possible by [improved] technology", as discussed in *Hughes Aircraft,* 717 F.2d at 1365, 219 USPQ at 483 (citing *Bendix,* 600 F.2d at 1382, 204 USPQ at 631); *Decca Ltd.,* 544 F.2d at 1080–81, 191 USPQ at 447–48; and *Eastern Rotorcraft Corp. v. United States,* 397 F.2d 978, 981, 184 Ct.Cl. 709, 154 USPQ 43, 45 (1967), *aff'd,* 158 USPQ 294 (Ct.Cl.1968).

To summarize the totality of changes: The input means in the '921 patent is a keyboard encoder that operates through conductive strips under the keys, whereas in the accused devices it is a scanning matrix encoder. The electronic means in the '921 patent is an integrated semiconductor array based on bipolar semiconductor technology; the accused devices use metal oxide semiconductors and embody significant advances in chip design and integrated circuitry. The display means in the '921 patent is a thermal printer, whereas the accused calculators use liquid crystal displays. Taken together, these accumulated differences distinguish the accused calculators from that contemplated in the '921 patent and transcend a fair range of equivalents of the '921 invention. Each individual difference, standing alone, could conceivably lead to a different result, by

application of this court's precedent. It is to the invention as a whole to which this same precedent directs our analysis.

The ALJ found that the technological breakthrough that made the miniature electronic calculator possible was the invention of the integrated circuit in 1958. Inventor Merryman had testified that "[s]imply making the determination that parts need to be small and interacted to fit in a pocket-sized housing does not take other than ordinary skill", but that it was the "[c]hoosing, developing and interacting, and all of those had to be done. None of those components were ready." Inventor Kilby similarly testified that "a number of new technologies [were] required" to achieve the size, cost and power objectives of the project which culminated in the '921 invention.

■ Equivalence of the subsequently-developed devices is not established by showing only accomplishment of the same result. "[A]bstractions cannot be patented." *Sealed Air Corp. v. U.S. International Trade Commission*, 645 F.2d 976, 985, 209 USPQ 469, 477 (CCPA 1981). As stated in *Westinghouse v. Boyden Power Brake Co.*, 170 U.S. 537, 569, 18 S.Ct. 707, 723, 42 L.Ed. 1136 (1898),

> even if the patent for a machine be a pioneer, the alleged infringer must have done something more than reach the same result.

■ We conclude that the total of the technological changes beyond what the inventors disclosed transcends the equitable limits illustrated, for example, in *Graver Tank, D.M.I., Hughes Aircraft,* and *Atlas Powder,* and propels the accused devices beyond a just scope of the '921 claims. The record before us contains substantial evidence to support the ALJ's conclusion that TI did not sustain its burden of proving infringement by the accused calculators under 35 U.S.C. § 112 paragraph 6.

### B.

TI presented the alternative argument that if the claims are not deemed literally infringed in terms of 35 U.S.C. § 112 paragraph 6, they should be held infringed in terms of the doctrine of equivalents.

When literal infringement under section 112 paragraph 6 is not present the doctrine of equivalents may nevertheless apply, and thereby secure to the patentee the fair scope of the patent. *See Graver Tank,* 339 U.S. at 607–08, 70 S.Ct. at 855–56; *Hughes Aircraft,* 717 F.2d at 1361, 219 USPQ at 480. In this case, however, where the claimed functions are all performed in the accused devices, the considerations discussed in part A also apply to an infringement determination in terms of the doctrine of equivalents.

■ Whether the issue is equivalency of a means that is described in the specification to perform a function in a "means" clause of a combination claim (*i.e.*, literal infringement), or equivalency to the claimed invention as a whole (*i.e.*, infringement by the *doctrine* of equivalents), the test is the same three-part test of history: does the asserted equivalent perform substantially the same function in substantially the same way to accomplish substantially the same result. (In the case of "means" clauses, of course, the function is that stated in the claim.) This test has been described in various ways, *see, e.g., Deller's Walker on Patents,* § 546–558 (2d ed. 1972).

In the case of literal infringement of a claim containing a "means" clause in terms of section 112 paragraph 6, the accused structure, composition, or process is compared with that described in the specification for performing the claimed function. In the case of infringement under the doctrine of equivalents, the accused structure, composition, or process is compared with the claimed invention as a whole.

The interplay between the doctrine of equivalents and the permissible scope of the claims may be limited by the prosecution history. *Builders Concrete, Inc. v. Bremerton Concrete Products Co.,* 757

F.2d 255, 258, 225 USPQ 240, 242 (Fed.Cir. 1985); *Caterpillar Tractor Co.*, 714 F.2d at 1115–16, 219 USPQ at 187–88; *see also Hughes Aircraft*, 717 F.2d at 1362–63, 219 USPQ at 481–82. There is nothing in the prosecution history to constrain the breadth of claim interpretation which TI proposes. TI is correct in its assertion that neither the prior art nor the prosecution history mandates exclusion of the accused devices from the reach of the claims.

■ While the prior art and prosecution history are necessary considerations in applying the doctrine of equivalents, they do not of themselves control the breadth of equivalents available under the doctrine. *See Hughes Aircraft*, 717 F.2d at 1363, 219 USPQ at 482. In this case, the determination turns on the totality of change in the accused devices from that described in the '921 specification. For the reasons discussed in part *A*, the extensive technological advances in all of the claimed functions support the ALJ's finding that the accused devices are not equivalent to the claimed invention, applying the criteria of *Graver Tank.*

■ The determination of equivalency by its nature is inimical to the basic precept of patent law that the claims are the measure of the grant. *Aro Manufacturing Co. v. Convertible Top Replacement Co.*, 365 U.S. 336, 339, 81 S.Ct. 599, 600–01, 5 L.Ed.2d 592 (1961). The doctrine of equivalents, ubiquitous since its origin in *Winans v. Denmead*, 56 U.S. (15 How.) 330, 14 L.Ed. 717 (1853), exists solely for the equitable purpose of "prevent[ing] an infringer from stealing the benefit of an invention." *Graver Tank*, 339 U.S. at 608, 70 S.Ct. at 856. To achieve this purpose, equivalency is judicially determined by reviewing the content of the patent, the prior art, and the accused device, and essentially redefining the scope of the claims. This constitutes a deviation from the need of the public to know the precise legal limits of patent protection without recourse to judicial ruling. For the occasional pioneering invention, devoid of significant prior art—as in the case before us—whose boundaries probe the policy behind the law, there are no immutable rules. We caution that the incentive to innovation that flows from "inventing around" an adversely held patent must be preserved. To the extent that the doctrine of equivalents represents an exception to the requirement that the claims define the metes and bounds of the patent protection, we hearken to the wisdom of the Court in *Graver Tank*, that the purpose of the rule is "to temper unsparing logic" and thus to serve the greater interest of justice.

The decision of the Commission that the claims are not infringed is

AFFIRMED.