## The LAITRAM CORPORATION

v.

## HEWLETT–PACKARD COMPANY, INC.

### No. 91–4023.

United States District Court,
E.D. Louisiana.

Oct. 15, 1992.

See also 791 F.Supp. 113.

fringe any claim of plaintiff's United States Patent No. 4,547,860 ("the '860 patent"). For the reasons that follow, the defendant's motion is DENIED.

## BACKGROUND

The patent at the heart of this dispute was issued in October 1985 to J.M. Lapeyre, a well-known inventor who was the founder of Laitram Corporation and its president during the period in which the events in this case occurred. The patent embodies an invention by which the number of keys on a handheld calculator could function both in a numerical mode and also potentially a multi-function mode. The factual claims are rather standard for this type of lawsuit.

Seeking a market for his invention, Mr. Lapeyre sought out Hewlett–Packard, the largest maker of handheld calculators. Mr. Lapeyre's relationship with Hewlett–Packard began shortly after Mr. Lapeyre filed the patent application in March 1983. This initial contact involved the disclosure of the keyboard concepts of the '860 patent by Mr. Lapeyre to Hewlett–Packard for their review. While HP did not express strong interest, at least two of the HP reviewers felt that the concepts deserved further consideration.

Mr. Lapeyre followed his preliminary disclosure by designing a demonstration device embodying some of his keyboard concepts. In order to demonstrate these concepts, a software program was written which would reprogram the keyboard of a conventional HP calculator, the HP 41C. A keyboard overlay was to be placed over the keyboard to show the user what functions the software assigned to a particular key. Among other things, the overlay showed both the function and the sequence of keys which were to be pressed in order to execute the function. The software reprogramming the HP 41C was created by one of the principal designers of the HP 41C, Dave Conklin of Firmware Specialists.

By April 1985, the demonstration device,

Steven W. Usdin, Phillip A. Wittmann, Dane S. Ciolino, Stone, Pigman, Walther, Wittmann & Hutchinson, New Orleans, La., Barry Louis LaCour, Laitram Corp., Harahan, La., Timothy J. Malloy, Lawrence M. Jarvis, McAndrews, Held & Malloy, Chicago, Ill., for plaintiff.

Alexander Hall Plache, Stewart Earl Niles, Jr., Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, La., S. Leslie Misrock, Jonathan A. Marshall, Brian D. Coggio, Stephen J. Harbulak, Edmond R. Bannon, Pennie & Edmonds, New York City, for defendant.

## ORDER AND REASONS

FELDMAN, District Judge.

Hewlett–Packard Company, a defendant in this patent case, moves this Court under Rule 56 for a partial summary judgment that the manufacture, use or sale of its Models 17B, 17BII, 27S and 42S calculators ("the accused calculators") does not in-

"the XQ2," was complete.[1] During the week of April 12, a delegation from Laitram and Dave Conklin met with employees of Hewlett–Packard's Corvallis division (which is responsible for the design of HP's handheld calculators). The XQ2 included a first numerical mode to enter numeric digits using single strokes of the keys numbered 0–9. In a second alpha mode, alphabetic characters were entered using two sequential, non-simultaneous keystrokes for entering each single alphabetic character. Three keys were used to shift the XQ2 from the first mode to the alpha mode. About a month after the demonstration with HP's Corvallis division, Mr. Lapeyre also demonstrated the XQ2 at an HP Calculator User's Conference.

Shortly after the Laitram delegation presented its XQ2 demonstration device, plaintiff asserts HP began its own preliminary work on the Pioneer Two Line Project, which eventually resulted in the production of the accused calculators. While originally not intended to include alpha entry, the project was modified to include the very alpha entry scheme that is accused of an infringement in this suit. The use of what HP terms the "soft alpha" scheme on these calculators allowed for alpha entry and numeric entry on a single keyboard. Prior to 1985, Hewlett–Packard had tried to create portable calculators that allowed for alphabetic character entry. But because HP had not yet developed the technology to reduce the number of keys, these calculators had full alphabetic keyboards in addition to the numeric keyboards; the resulting design was that of a hinged "clam shell" shape with a total of 72 keys. By HP's own admission, "the alpha flap is cumbersome, and dominates a product which is primarily numeric oriented and is a mechanical nightmare." [2]

The outward response by HP to the XQ2, however, remained aloof even after HP had allegedly embarked on developing an alpha entry system using a single keyboard. In December 1985, Mr. Lapeyre sent letters and demonstration devices to William Hewlett, the founder of Hewlett–Packard, and also to John Young, then the president of HP. Accompanying those submissions was the '860 patent which, by then, had been approved. Beyond letters expressing admiration and gratitude, Mr. Lapeyre's efforts to crack the walls of Corvallis were without result. By the spring of 1986, Hewlett Packard, which had characterized the XQ2 as having a "busy look," rejected Mr. Lapeyre's concepts in a letter.

It is the contention of the plaintiff, Laitram Corporation, to which the patent was assigned, that the entire time that Mr. Lapeyre was lobbying Hewlett–Packard with his patented concepts and meeting no success, HP was in fact copying those very concepts in the Pioneer Two Line Project. The infringing products that resulted include the HP Models 17B, 17BII, 27S, and 42S calculators. The defendants counter that the accused calculators do not infringe on the '860 patent, but use prior art.

To resolve these competing claims about the patent involves an examination of what the patent claim embodies. The defendant argues that the core claim that must be proven to be infringed is claim 1 of the '860 patent. This claim is defined by a preamble, three elements and a "whereby" clause:

Preamble:

A computer keyboard system for a computer operable to execute a large number of functions in response to keyboard selection of the various accessible functions, comprising in combination,

Claim Element 1:

keyboard keys numbering X including ten digit keys 0 to 9,

Claim Element 2:

means for operating the keyboard in a first numerical computer mode of operation activating the keys for executing a corresponding set of designated functions with a single keystroke including the activation of the digit keys for se-

---

1. The XQ2 is the subject of another infringement claim, and still another motion for partial summary judgment.

2. Evett Exhibit A at HP27612 as cited in the Plaintiff's Opposition p. 18.

quentially entering decimal digits on successive single keystrokes to form multi-digit numerical words, and

Claim Element 3:

means including in said set of keys a further execute key with corresponding operation means for shifting the mode of action from the first operation mode to a second multi-function computer mode requiring a plurality n of sequential non-simultaneous keystrokes of any selected ones of said keys for execution of a further set of designated functions,

whereby the keyboard has the capability of processing $X^n + X$ designated functions.

Each side, of course, reads the same language as having a different effect when applied to the accused calculators from that taken by the adversary. However, it is not necessarily the task of this Court in the present motion environment to choose which side is correct; rather, this Court must determine whether no genuine issue of material fact exists as to whether claim 1 of patent '860, as properly interpreted, has been infringed.

## I.

Federal Rule of Civil Procedure 56 instructs that summary judgment is proper if the record discloses no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. No genuine issue of fact exists if the record taken as a whole could not lead a rational trier of fact to find for the non-moving party. See *Matsushita Elec. Indus. Co. v. Zenith Radio.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538 (1986). A genuine issue of fact exists only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

The mere argued existence of a factual dispute does not defeat an otherwise properly supported motion. See *id.* Therefore, "[i]f the evidence is merely colorable, or is not significantly probative," then summary judgment is appropriate. *Id.* at 249–50,

106 S.Ct. at 2511 (citations omitted). Summary judgment is proper if the party opposing the motion fails to establish an essential element of his case. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). In evaluating the summary judgment motion, the court must read the facts in the light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255, 106 S.Ct. at 2513.

Two theories define infringement in patent law: literal infringement and the doctrine of equivalents. The defendant claims that summary judgment is appropriate because the accused calculators do not literally infringe and because the doctrine of equivalents is not applicable in this case, or if it is, the plaintiff has not shown facts supporting a valid claim.

### A.

Literal infringement exists if the accused device falls within the scope of the asserted claims as properly interpreted. *Palumbo v. Don–Joy Co.*, 762 F.2d 969, 974 (Fed. Cir.1985). Thus, the asserted claims must be compared with the product accused of infringement. *Id.* This infringement inquiry is a two step process: what is the scope of the claims; and do the claims cover the accused device. *Id.* The second part of the test, which is the ultimate determination of infringement, is a fact issue, and a motion for summary judgment on that question must be "approached with a care proportioned to the likelihood of its being inappropriate." *See D.M.I., Inc. v. Deere & Co.*, 755 F.2d 1570, 1573 (Fed.Cir. 1985). Although the construction of a claim is a question of law, if that construction is disputed and extrinsic evidence is necessary to explain its terms, then "an underlying factual question arises, and construction of the claim should be left to the ... jury." *Palumbo*, 762 F.2d at 974.

In this case, claim 1 of the plaintiff's patent uses "means plus function" language. To interpret these functional claims, one must invoke the last paragraph of 35 U.S.C. § 112:

An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material or acts described in the specification and equivalents thereof.

The statute, then, clearly envisions that the patentee is entitled to a claim covering equivalents as well as the specified structure.[3] In interpreting a "means plus function" claim, a court may consider the language of the claim, the patent specification, the prosecution history of the patent, other claims in the patent and expert testimony. Whether an accused device is a § 112 "equivalent" of the described embodiment is a question of fact. *See Palumbo*, 762 F.2d at 975 *citing D.M.I., Inc.*, 755 F.2d 1570 (Fed.Cir.1985). This Court, of course, must be suitably wary of granting summary judgment on the question of whether a claim covers an equivalent if the issue has been placed in dispute.

 The other conceptual route to patent infringement is the doctrine of equivalents. This equitable doctrine is used in situations where literal infringement is absent but the accused device "performs substantially the same function in substantially the same way to obtain the same result," *Graver Tank & Mfg. Co. v. Linde Air Products Co.*, 339 U.S. 605, 608, 70 S.Ct. 854, 856, 94 L.Ed. 1097, 85 USPQ 328, 330 (1950), and there is evidence of pirating or copying by the defendant. *See Hormone Research Foundation, Inc. v. Genentech, Inc.*, 904 F.2d 1558, 1564 (Fed.Cir.1990). The resolution of the *Graver Tank* test is also one of fact and this Court must be hesitant to usurp that determination from the jury.

### B.

Before this Court are competing interpretations of claim 1 of the '860 patent. Hewlett–Packard argues that claim 1 requires that all "X" keys (where X is the total number of keys on the keyboard), including the digit keys (0–9), must operate in at least two specific modes, a first "numerical" mode of action and a second "multi-function" mode. HP maintains that all of the keys on the accused calculators do not operate in this dual manner. The digit keys on the HP 17B and 17BII operate only in numerical mode and those on the HP 27S and 42S, using prior art, operate in a second mode only when a "color coded prefix key" is depressed but do not operate in a multi-function manner.

The defendant's next argument is that claim 1 of the '860 patent requires that there be a *single* "execute key" included within the X keys that allows all of the keyboard keys to be shifted into the second multi-function computer mode. But Hewlett–Packard's accused calculators, the argument goes, do not employ a single execute key as required by the claim.

A third variation that the defendant urges is that the keyboard claimed in the '860 patent requires many more functions from the keys than Hewlett–Packard's accused calculators deliver. The defendant interprets the claim as requiring that for "X" number of keys requiring "n" sequential, non-simultaneous keystrokes (where n is the number of keystrokes required to select a function), the keyboard *must* be able to process $X^n + X$ "designated functions." Since, the defendant argues, the purpose is to minimize the number of keys to 12 or 16, if n was a minimum of 2 for every secondary function (i.e., each designated function available in a second mode of operation was executed using two strokes of the keyboard keys) and $X = 16$, then $X^2 + X = 272$ designated two stroke functions. But Hewlett–Packard's calculators have many more keys than the maximum of 16 embodied in claim 1 (in fact 37) and do not process anywhere near $37^2$ or 1,369 designated two stroke functions.

The defendant's conclusion is that these variations between the claim and the ac-

---

**3.** This Court is compelled to point out that there is a distinction between doctrine-of-equivalents analysis and a literal infringement analysis involving "equivalents" under § 112. The former is used (usually) where literal infringement is absent but there is evidence of pirating, while the latter is, in fact, a literal infringement. *See Palumbo v. Don–Joy Co.*, 762 F.2d at 975 note 4.

cused calculators defeat any suit claim that the defendant has literally infringed on the plaintiff's patent. The plaintiff, however, has a different interpretation of claim 1 and reaches a different conclusion.

■ The plaintiff argues that the defendant, in fact, does literally infringe on claim 1 of the '860 patent. The plaintiff disputes the defendant's interpretation of claim 1 as limiting the number of keys to 12 or 16. In fact, the claim reads "keyboard keys numbering X including 10 digit keys 0–9." There is in this language, the plaintiff claims, nothing that limits the number of keyboard keys to 12, 16 or 37.[4]

The accused calculators, the plaintiff claims, clearly satisfy the requirement of claim element 2 which merely demands that there be an initial numerical computer mode of operation using single keystrokes. All of the accused calculators have this mode.

Claim element 3 is directed to the means for shifting the mode of action from the first operation mode to a second multi-function computer mode which requires a plurality n of non-sequential, non-simultaneous keystrokes in order to execute a further set of functions. The defendant argues that the claim requires all of the keyboard keys to be operable in the second multi-function mode, but the plaintiff demurs that it only requires that "selected" keys be operable. The plaintiff also disputes the defendant's conclusion that the claim requires that the calculator process $X^n + X$ functions. The language of the claims states, instead, that the calculators have the "capability" or potential to process that number. It is not a requirement. And the plaintiff's expert asserts that the accused calculators have this potential.

It is this third element of claim 1 that uses the "means plus function" language. The construction of this aspect of the claim requires, the plaintiff asserts, a resolution of disputed questions of fact as to whether the accused calculators qualify as equiva-

lents. The core of the plaintiff's analysis on this issue is an affidavit by Rodney Schwartz, an expert in electrical engineering who examined the accused products in light of his interpretation of the claim elements.

Contrary to the defendant's assertions, the plaintiff argues that this claim element is not limited to a single identifiable execute key to shift between the modes. Rather, this element contemplates a keyboard where *at least* one key press is available to allow the user to shift between the two modes. The plaintiff maintains that this interpretation is supported by the specification as it describes embodiments of the invention that employ at least three different two stroke modes of operation. A first temporary two stroke mode of operation utilizes a single stroke of the execute key to shift to a two stroke mode of operation. After the two stroke function is performed, the calculator automatically reverts to the single stroke numerical mode. The second two stroke mode utilizes three sequential keystrokes of two separate keys to shift into a continuous two stroke mode. Finally, the alpha two stroke mode utilizes three sequential keystrokes of three keys to shift into a continuous two stroke mode to perform alphabetic character entry. While there is but one execute key involved in each of these procedures, other keys apparently assist in moving into the secondary function mode.

The plaintiff asserts that each of the accused calculators has a single stroke and a two stroke mode of operation. In particular, the two keystroke mode of operation in the four HP calculators is for the entry of alphabetic characters. The plaintiff says that the claim language does not require that every key be operable in the second mode, but, rather, states that "any selected ones of said keys" may be stroked for execution of a further set of designated functions. The claim does not require that each and every key operate in the second

---

**4.** The fact that claims 17 and 19 do limit the number of keyboard keys is not dispositive because under the doctrine of claim differentiation, if some claims are broad and others nar-row, the narrow claim cannot be read to limit the broad claim to avoid infringement. *Uniroyal, Inc. v. Rudkin–Wiley Corp.,* 837 F.2d 1044, 1054–55 (Fed.Cir.1988).

mode. Moreover, the plaintiff adds, the embodiments disclosed in the specification confirm this (in one embodiment 11 of 12 keys operate in the second mode and in the other 14 of 16 keys are operable but in neither embodiment is each and every key operable).

In contrast to HP's assertion that no literal infringement is evident, the plaintiff declares that there has, in fact, been infringement. In particular, the plaintiff's expert points to the dual modes of operation in the accused calculators with a single stroke numeric mode as well as a two keystroke mode for entry of alphabetic characters. In each of the accused calculators, the plaintiff claims that the structure of the alphabetic entry is a § 112 equivalent of the "shift means" element of claim 1 of the '860 patent. The defendant, on the other hand, asserts that this merely makes use of prior art and in no way infringes on the plaintiff's patent.

### C.

■■■ For this Court to find that literal infringement has occurred, the accused device must "embody every element of the claim as properly interpreted (citations omitted). If the claim describes a combination of functions, and each function is performed by a means described in the specification or an equivalent of such means, then literal infringement holds." *Texas Instruments, Inc. v. United States International Trade Commission*, 805 F.2d 1558, 1562 (Fed.Cir.1986). After considering all the submissions, countersubmissions, the claim language, prosecution history, specifications and expert witness material, this Court can only conclude that this case is patently inappropriate for summary judgment.[5]

The Court has reviewed the competing interpretations of the claim in light of the extrinsic evidence. While neither side is manifestly correct, there is enough conflicting evidence to support both versions so that summary judgment would be an invasion of the province of the jury.

A material issue of fact exists as to whether the defendant's calculators satisfy claim element 1 ("keyboard keys numbering X including ten digit keys 0 to 9") as read in light of the specification. The specification certainly envisions a calculator with few keys, as is seen in its repeated criticisms of the prior art models with 35 or more keys. However, although the specification can be understood as the inventor's vision of the most powerful or best application of his idea, it is not necessarily the most practical one. *See* 35 U.S.C. § 112 (the specification shall "set forth the best mode contemplated by the inventor of carrying out his invention.") An inventor's vision of the possible should not be limited by the realities of the practical. An inventor may be taken by the power of his idea and not by how it can be harnessed to the disciplines of the market, but whatever motivates his conception of the best mode for his invention, this Court is not required to confine the inventor to those embodiments that he envisions in the specification nor should it be. *See SRI International v. Matsushita Electric Corp.*, 775 F.2d 1107, 1121 (Fed.Cir.1985) ("The law does not require the impossible. Hence, it does not require that an applicant describe in his specification every conceivable and possible future embodiment of his invention.") And so, whether claim element 1 is to be read as requiring a certain number of keys is a question for the jury.[6]

As to the claim element 2, there seems to be no question that the accused calculators operate in a "first numerical computer

---

5. The defendant stresses that the plaintiff's arguments are erroneous as a matter of law because they ignore the specification and prosecution history, and attempt to redraft the language of claim 1. This Court has examined the plaintiff's arguments in light of this charge and disagrees with defendant.

6. This Court is puzzled as well by the fact that the HP calculators preceding the Pioneer Two Line, which attempted to have both numerical and alpha entry systems, required two keyboards, a clam shell shape and 72 keys to fulfill this mission. If HP utilized the patented ideas in the '860 patent, it certainly was able to reduce the number of keys while increasing the functions per key as envisioned by the '860 patent.

mode of operation executing a corresponding set of designated functions with a single keystroke."

It is claim element 3 that this Court has considered most closely. The defendant's argument that the '860 patent requires a single execute key is, in many ways, persuasive. The specification and embodiments have a single execute key. The plaintiff's expert interprets the claim language ("including in said set of keys a further execute key") as not limited to a single key. While ordinarily such a conclusionary statement would carry little weight in a motion for summary judgment, where the statement is made in a patent case by a person skilled in the ordinary art then the statement itself could be important.

Moreover, this Court cannot now say on this record that having more than one execute key to move to the secondary multi-function mode of operations is inconsistent with claim 1 of the '860 patent. Earlier this Court made the point that the patentee is not to be limited to only those embodiments declared in the specifications. It follows that the plaintiff might not be limited to only one execute key (particularly where the claim language is unclear) when the purpose of the execute key (to move to secondary multi-function mode of operation) is still fulfilled by the additional execute key. Not only does that appear to be the case in this instance, but also the specification, while relying on a single execute key, also recognizes that key cannot work alone, but rather requires other keys to move to the secondary mode. It would appear to this Court that a decision based on practical considerations of design to increase the number of execute keys rather than rely on using a single one in combination with different keys for different functions might not be an avenue to escape infringement.

■ In addition to finding that there is an issue of fact as to the proper interpretation of the number of execute keys covered in claim element 3, this Court also finds a material fact issue arising from the plaintiff's assertion that the alpha entry systems on the accused calculators are § 112 equivalents of the '860 patent. The HP soft alpha entry system is strikingly similar to the alpha entry system in the '860 patent. Whether it is a § 112 equivalent is a question for the jury. The plaintiff charges that HP copied this alpha entry system outright. Whether the defendant came to this system independently or by copying the XQ2 is, however, irrelevant if the soft-alpha system is a § 112 equivalent.[7]

Finally, there is the question of the scope of the "whereby clause" ("whereby the keyboard has the capability of processing $X^n + X$ designated functions"). The defendant argues that this clause requires that the keyboard process $X^n + X$ functions but the plaintiff counters that it merely means that it has the potential in light of the increased power given to each key by the '860 patent. Who is correct may turn on the intended use of "capability." A reasonable interpretation of capability would be, as plaintiff suggests, potential; if that definition applies, then the plaintiff would be correct that $X^n + X$ functions is not required. Additionally, this Court returns again to its sense, embodied in 35 U.S.C. § 112, that the concept envisioned in the '860 patent is patented in its most powerful form but should be read, where the language permits, to include less powerful, but perhaps more practical utilizations.

Since this Court has determined that the proper interpretation of the scope of claim 1 of the '860 patent is a question that should be decided by the jury, it naturally follows that the second step of this Court's analysis, whether the accused calculators infringe the properly interpreted claim, cannot be reached.

### D.

■ Finally, what about the doctrine of equivalents in all this? To prevail under the doctrine of equivalents, a patentee must show that the accused device "performs substantially the same function in substantially the same way to obtain the

---

**7.** It is relevant, however, under the doctrine of equivalents.

same result." *Graver Tank & Mfg. Co. v. Linde Air Products Co.,* 339 U.S. 605, 608, 70 S.Ct. 854, 856, 94 L.Ed. 1097, 85 USPQ 328, 330 (1950). This is not an open-ended doctrine. It reflects "the equitable concept that claims should be read in a way that avoids enabling an infringer to 'practice a fraud on a patent.'" *Texas Instruments, Inc. v. U.S. International Trade Commission,* 805 F.2d 1558, 1563 (Fed.Cir.1986) quoting *Graver Tank,* supra; *see also, Hormone Research Foundation, Inc. v. Genentech, Inc.,* 904 F.2d 1558, 1564 (Fed. Cir.1990) (doctrine of equivalents appropriate to prevent a pirating of the patentee's invention). Whether an accused device does, in fact, perform "substantially the same function in substantially the same way to obtain the same result" is a question of fact. However, the defendant argues that there is no equitable basis for the application of this doctrine in this case.

■■■ The defendant is correct that the doctrine of equivalents can only be applied if an equitable basis anchors its application. The plaintiff argues such a basis exists. The plaintiff charges that the defendant copied the HP soft alpha system after gaining access to the XQ2 demonstration device. Obviously, the timing of events will deserve close scrutiny. Until the Laitram delegation demonstrated its XQ2 device to Hewlett–Packard's Corvallis group, HP's success in creating a handheld single keyboard unit that had alpha entry capability was possibly unimpressive. It is charged that shortly after the XQ2 was in HP's possession, work was then begun within the Pioneer Two Line project that would culminate in the production of the accused calculators with just such capability. The defendant submits, supported by the affidavit of Dennis York, the inventor of the HP soft alpha system, that work on this project had been going on for weeks prior to the Laitram meeting in April 1985 and that York was not aware of the XQ2 system until December of 1985. This Court cannot say on the record that copying has occurred in this case. However, it also cannot say copying has not occurred.

As this Court has noted, the similarities between the alpha entry system in the accused calculators and that in the '860 patent are indeed striking. Whether the plaintiff can carry its burden under the doctrine of equivalents is a question that cannot be summarily decided.

New Orleans, Louisiana, October 14, 1992.

